UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

MARIO V. BAYNES,     )
             )
      Petitioner,  )   Case No. 1:03-cv-835
             )
v.            )   Honorable Robert Holmes Bell
             )
KURT JONES,      )
             )   **REPORT AND RECOMMENDATION**
      Respondent. )
_____)

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254.  Petitioner is serving a term of life without parole, imposed by the Kalamazoo County

Circuit Court on December 4, 2000, after a jury convicted Petitioner of first-degree felony murder,

MICH. COMP. LAWS § 750.316.  In his *pro se* petition, Petitioner raises two grounds for relief, as

follows:

  I.  WHERE THE ONLY DISPUTE AT TRIAL WAS WHETHER MARIO
    BAYNES COMMITTED THE CRIMES AND NOT WHICH CRIMES
    WERE COMMITTED THE IRRATIONAL AND INCONSISTENT
    VERDICTS DEMONSTRATE THAT THERE WAS INSUFFICIENT
    EVIDENCE AND THE VERDICTS WERE IMPERMISSIBLE
    COMPROMISES AND DENIED PETITIONER BAYNES DUE PROCESS
    AND A FAIR TRIAL.

  II.  WHERE MARIO BAYNES WAS CONVICTED FOR FELONY MURDER
    FOR A KILLING THAT OCCURRED DURING A HOME INVASION,
    THE TRIAL JUDGE'S CONFUSING AND INCORRECT INSTRUCTIONS
    THAT THE FELONY MURDER WAS NOT A SPECIFIC INTENT
    OFFENSE DENIED BAYNES DUE PROCESS AND A FAIR TRIAL.

Respondent has filed an answer to the petition (docket #15) stating that the grounds should be denied because they are either procedurally defaulted or without merit. Upon review and applying the AEDPA standards, I find that ground one is without merit and ground two is procedurally defaulted. Accordingly, I recommend that the petition be denied.

## Procedural History

### A. Trial Court Proceedings

The state prosecution arose from the shooting death of Angel Ryan on June 17, 2000. Petitioner was charged with one count of open murder, MICH. COMP. LAWS § 750.316; assault with intent to murder Clifford McCormack, MICH. COMP. LAWS § 750.83; first-degree home invasion, MICH. COMP. LAWS § 750.110a(2); felonious assault of Philip Smith, MICH. COMP. LAWS § 750.82; and four associated counts of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b. Following a preliminary examination on July 13, 2000, Petitioner was bound over on all charges. He was tried before a jury beginning November 7, 2000, and concluding on November 13, 2000.

On the evening of June 16, 2000, Clifford McCormack, Mario Baynes, Michelle Sims, and others, went over to Latisa Tabor's house. Antwon ("Money") Lewis also was present. (Tr. I, 165-68.) Those present at Tabor's home all were drinking alcohol. (Tr. I, 183; Tr. I, 201.) According to the trial testimony of Sims, McCormack, Tabor and Lewis, sometime after midnight, McCormack, Baynes, Lewis, Sims and Taylor left Tabor's home in Tabor's car. Tabor planned to drive all of them back to Angel Ryan's apartment. (Tr. I, 184; Tr. I, 202; Tr. II, 244-45; Tr. II, 349-52.) Tabor and Sims sat in the front and the men in the back. Petitioner was riding in the rear behind Tabor's driver's seat. (Tr. I, 169, 171; Tr. I, 202; Tr. II, 245; Tr. II, 352.) Petitioner began

- 2 -

to kick the back seat and to call Tabor names.  (Tr. I, 203; Tr. II, 245; Tr. II, 354.)  Tabor pulled off the road, got out and pulled the seat forward, telling Petitioner that he would need to walk home. Petitioner got out of the car, but immediately jumped into the driver's seat.  Sims quickly removed the keys from the ignition.  Petitioner then indicated that he was just teasing.  Tabor warned Petitioner that, if he calmed down, she would drive him home.  If not, he would need to walk.  (Tr. I, 169-70, 203; Tr. II, 245; Tr. II, 353.)  All of the riders got back in the car.  A few blocks later, they stopped at a gas station and Lewis went in to get something to eat.  (Tr. I, 172; Tr. I, 203; Tr. 245.) Petitioner then kicked Tabor's seat repeatedly, and she got out of the car.  Petitioner got out, too. Petitioner made remarks to Tabor and attempted to hit her.  At that point, McCormack grabbed Petitioner and the two began to fight.  McCormack won the fight.  Petitioner went to a phone booth and then left with someone else.  (Tr. I, 172-73; Tr. I, 203-05; Tr. II, 245-46.)

The others got back in the vehicle and drove to Angel Ryan's apartment, which McCormack shared.  Ryan lived in Apartment 105 of Building 1501 of the Alamo Hills Apartment complex.  (Tr. I, 174, Tr. II, 355.)  Lewis left the group when they arrived at the Alamo Hills Apartments, saying he was going home.  (Tr. I, 205.)  When Sims, McCormack and Tabor arrived at Angel Ryan's apartment, Angel's brother, Floyd Ryan, was in the living room sleeping in a chair. Angel was in bed sleeping.  (Tr. I, 174; Tr. I, 206; Tr. II, 247.)

Sims testified that, at approximately 1:30 a.m. on June 17, 2000, someone knocked on the door to Ryan's apartment.  McCormack opened the door and peered around it.  Sims heard two shots, which she first thought were firecrackers.  She then saw McCormack run down the hall to the bedroom with Petitioner following.  (Tr. I, 175.)  Petitioner carried a gun with a six-inch barrel, pointing it toward McCormack.  (Tr. I, 176.)  Sims got up from the couch on which she had

been sitting and ran to the side of a chair, and she pulled Tabor toward her.  (Tr. I, 177.)  Sims heard

numerous shots, followed by a brief silence.  She then heard three more shots.  (Tr. I, 177, 194.)

Sims thought she heard Tabor's daughter crying.  She then heard Floyd Ryan cry out that they had

shot his sister.  Sims tried to help Floyd find the telephone and then responded to Tabor's cries for

help from Angel's room.  She saw Angel Ryan lying on her back on the floor between her bedroom

and the hallway.  Tabor was giving Ryan CPR.  Sims tried to check Ryan's pulse but was overcome

with nausea.  Ryan was not responsive and was gasping for air.  Sims got on the phone again to the

police, asking when they would arrive.  Ryan never regained consciousness.  (Tr. I, 179-80.)  Sims

did not see anyone enter the apartment after Petitioner.  (Tr. I, 193.)

   Tabor testified similarly to Sims.  Tabor, however, did not see Petitioner's face when

he came into the apartment.  Instead, she saw only a black man in blue shirt and blue jeans like those

Petitioner had been wearing a short time before.  (Tr. I, 207, 210.)  After hearing numerous shots,

Tabor heard the front door slam.  She came from behind the chair and ran down the hallway.  She

saw Angel lying on her back on the floor between the bedroom and hallway.  She rolled Angel over

in order to see if she was shot from the back because she did not see any bleeding from the front.

Ryan began CPR.  (Tr. I, 208-09.)

   Floyd Ryan testified that he was the brother of the victim, Angel Ryan.  (Tr. I, 219-

20.)  He was sleeping in the chair in the living room and Angel was asleep in the bedroom.  (Tr. I,

200.)  He testified that the two girls came to the apartment.  He did not recall seeing McCormack,

but he had been sleeping.  (Tr. I, 222.)  At some point, a person kicked the door in and came into the

apartment shooting a .9mm handgun.  (Tr. I, 222-23.)  He identified Petitioner as that person.  (Tr. I,

223.)  Floyd Ryan got behind the end of the couch.  (Tr. I, 228.)  After the shooting ended, he walked

- 4 -

back toward Angel's bedroom and saw her coming out of her room. She fell into his arms. (Tr. I, 227.) He called 911 and waited for the police to come. (Tr. I, 227.) He did not see McCormack until after the police arrived, when the police walked him into the house. (Tr. I, 228.) Floyd Ryan did not see anyone else come into the apartment after Petitioner. (Tr. I, 229.)

Clifford McCormack's testimony paralleled that of Sims and Tabor with respect to the events leading up to the fight at the gas station. He testified that he won the fight. (Tr. II, 245-46.) After the fight ended, Petitioner threatened to kill everyone. Prior to that night, McCormack had only met Petitioner on a few occasions. (Tr. II, 251.)

According to McCormack, when he, Tabor and Sims arrived at Angel Ryan's apartment, Angel's brother, Floyd, was passed out in a chair in front of the television. Angel was sleeping in her bedroom. (Tr. II, 247-48.) While they were at the apartment, McCormack left for a short while to talk with Lewis. He assumed Petitioner may have gone to see Lewis because Petitioner frequently was at Lewis' apartment. Lewis was present with several other men, but Petitioner was not there. (Tr. II, 259-60.) After McCormack returned to Ryan's apartment, there was a knock at the door. McCormack answered the door and clearly saw Petitioner holding what looked like a .9mm pistol. (Tr. II, 248, 252.) Petitioner said, "What's up now, Mother Fucker?" and fired the gun. McCormack kicked the door shut and started running down the hallway. He paused at the corner of the hallway, considering trying to catch Petitioner coming around the corner. The door flew back open and Petitioner followed McCormack, firing his gun. McCormack ran, glancing over his shoulder as he ran. He saw Petitioner chasing him and firing his gun. (Tr. II, 257, 271-72, 275.) McCormack shut the bedroom door, stood to its side, and held the door shut with his foot and hand. Petitioner started shooting through the door. (Tr. II, 248-49.) As McCormack stood next to the door,

Angel came toward him, asking if he was injured.  She then stood by the closet, also located to the side of the door.  When he heard the gun click as if it had run out of bullets, McCormack asked Angel to open the window.  He told her to jump, but she would not, saying that someone was standing outside the window.  McCormack then told her to lie on the floor while he went to get some help.  McCormack dove through the screen and out of the first floor window and ran around the building into the woods. (Tr. II, 249, 256.)  McCormack came back through another building.  By the time he got there, the police had arrived.  (Tr. II, 249-50.)  At some point during the shooting and the running away, McCormack retained two injuries to his leg that he believes were caused by bullets.  (Tr. II, 283, 299, 302.)  The injuries were through the "meat" of his leg and did not require a hospital visit.  Instead, they were treated by his mother, a doctor, and his sister, a nurse.  (Tr. II, 306.)

Kalamazoo Department of Public Safety Sergeant James Mallery was the manager of the crime scene.  (Tr. II, 308.)  He arrived at the scene in the early morning hours of June 17, 2000, in response to radio notice from dispatch that there had been a shooting at 1501 Alamo Hills.  (Tr. II, 312, 318.)  Sergeant Tracey Seifferly arrived in her squad car just behind Mallery's car.  Together, they went into the apartment.  (Tr. II, 312, 318, 322.)  Angel Ryan was lying on her back, partially in the doorway to the bedroom and partially in the hallway.  (Tr. II, 312, 318, 322.)  Seifferly noticed two bullet wounds, one to Ryan's right shoulder/neck area and one on her right arm.  (Tr. II, 322-23.)  Sergeant Kevin Lenkart reported that he had located a pulse.  Seifferly and two emergency officers began CPR until the paramedics arrived.  (Tr. II, 323.)  Angel Ryan never was conscious or responsive.  (Tr. II, 323-24.)

Sergeant Kevin Lankert testified that he arrived just as Seifferly and Mallery were going into the building. (Tr. II, 329.) He walked into the apartment knowing that a woman had been shot. He noticed four bullet casings on the floor near Ryan's legs and feet. He assisted the firefighters who already were present with CPR. (Tr. II, 330-31.) The officers took care not to disturb the position of the casings during treatment of Ryan and her subsequent removal in the ambulance. (Tr. II, 331-32.) Lankert followed the ambulance to the hospital. He was present at 2:21 a.m., when an emergency room doctor pronounced Ryan dead. (Tr. II, 332.)

Police Officer Jeff Vanderwiere interviewed Clifford McCormack at the scene, after McCormack approached and joined the group of building residents who were outside. McCormack was extremely emotional, ranging from irate to very worried about the victim. (Tr. II at 337.) After interviewing McCormack at the scene, Vanderwiere escorted McCormack to the police station so that Detective Alofs could conduct a more in-depth interview. (Tr. II at 338.) Officer Jeff Deblecourt entered the apartment with Vanderwiere, Lenkart and Seifferly. (Tr. II at 341.) While other officers tended to Ryan, Deblecourt interviewed Latisa Tabor and Floyd Ryan. (Tr. II at 343.)

As previously noted, Antwon (Money) Lewis testified consistently with Sims, Tabor and McCormack about the events of June 16 and 17, 2000, up to the time they arrived at Alamo Hills. (Tr. II, 349-51.) Lewis did not go to Angel Ryan's apartment, but instead went to Christina Kinnee's apartment for a short time. He then went upstairs to Annie Williams' apartment. (Tr. II, 355.) Annie William's apartment was located at the other end of the same building as that of Angel Ryan, but on the second rather than the first floor. (Tr. II, 356.) When he was in Williams' apartment, he looked out the window and saw Petitioner walking outside. (Tr. II, 355-56.) He was going to go down to talk to Petitioner because they were friendly, but others told him not to because

- 7 -

there had been a shooting.  (Tr. II, 358.)  Lewis then saw Petitioner hit a teenager in the forehead with a pistol.  (Tr. II, 357-58, 363.)  After the shots were fired, Lewis tried to call Ryan's apartment. (Tr. II, 360.)  Christina Kinnee went down to Ryan's apartment and returned to say that Angel Ryan had been shot.  Lewis then ran down toward Ryan's apartment, looked, and left the building.  (Tr. II, 361.)

Annie Williams testified that, on the evening of the shooting, she and a group of friends, including Christina Kinnee and Lewis, were playing cards, drinking and listening to music. (Tr. II, 371.)  The window was slightly cracked, and Williams heard some noise outside.  She went to the window and saw three men standing in front of the building.  She then saw Petitioner coming down a little hill toward the sidewalk, not from inside the building.  (Tr. II, 373-74, 382.)  Petitioner asked one of the other young men something and then hit him in the head with a gun.  (Tr. II, 373.) "China man"[1] came down the hill after that, holding a gun in each hand.  (Tr. II, 374-75, 380.) Petitioner and China man each fired two shots.  (Tr. II, 374, 384.)  Then Petitioner and China man took off, running in the same direction the other three men ran, toward the end of the building. (Tr. II, 374, 380.)  Williams testified that she saw the police collect casings from both outside and inside the building.  (Tr. II, 384.)

Christina Kinnee testified that, at about midnight on the night of June 16, 2002, she went to Meijer's with Knot, Bumby, Baylon and Tequila.  (Tr. II, 393.)  Returning from the store, the group passed the Summit Park Apartments.  (Tr. 393-94.)  She saw Petitioner using a cordless telephone and he appeared very upset or angry.  The telephone was clenched in his hand.  (Tr. II, 395.)  The group pulled over and asked him if he was all right.  (Tr. II, 394, 395.)  Petitioner did not

---

[1] "China man" was identified by another witness as Charles Walker.  (Tr. II, 427.)

- 8 -

respond.  (Tr. II, 3995.)  Bumpy got out of the car and went somewhere.  Bumpy then called Knot out of the car and they had a conversation.  Everyone then left and, when they did so, Petitioner was still on the corner with a cordless phone.  (Tr. II, 394.)  The group then proceeded toward Knot's mother's house.  (Tr. II, 396.)  While in the car, Bumpy and Knot discussed whether they should help Petitioner.  Kinnee advised that "If you mess with Bumpy, . . . you gonna do the rest of your life because Bumpy does things on the spur of the moment; he doesn't think about the consequences or whatever."  (Tr. II, 397.)  The group then went back to Alamo Hills to Annie Williams' apartment to play cards.  (Tr. II, 397-98.)  She was playing cards.  She and Baylon were partners and had just won a hand.  She stood to do a high-five and looked out the window to see Petitioner coming down the hill.  (Tr. II, 398.)  She heard, "Where is he at?  Where is he at?"  She then saw Petitioner hit a young man in the head with a gun.  (Tr. II, 399.)  The young man then ran away toward the building. (Tr. II, 400.)  About a minute or minute-and-a-half after Petitioner arrived, Kinnee saw China man come down through the grass from the same direction Petitioner had come.  (Tr. II, 400.)  As China man came down the hill, he slipped and she then saw the chrome of one of the two guns he was carrying.  (Tr. II, 401, 404, 415.)  Both Petitioner and China man ran toward the door at the end of the building.  (Tr. II, 402.)  Sometime after, she heard the building door slam open and saw Petitioner and China man run away from the building, up the hill she first saw them descend.  (Tr. II, 409, 417.)  Her boyfriend, Antwon (Money) Lewis, got agitated and took off his shirt and was going to go downstairs.  Knot told him not to go.  Kinnee was not aware of earlier events.  She told Lewis she was going to call Angel.  Lewis told her that he would go to Angel's apartment instead.  (Tr. II, 405-06.)  After Lewis did not promptly return and after seeing police, she went downstairs to her own apartment, where she found Lewis.  (Tr. 406-07, 417.)  She saw the paramedics and ran down

to Angel's apartment.  (Tr. II, 406-07.)  She saw Clifford McCormack and learned that Angel, who

was Kinnee's best friend, had been shot.  McCormack told Kinnee to call Ryan's mother and let her

know what had happened.

Tara Walton testified that, on the night of June 16, 2002, she, Eugene Jones, Angie

Joyce, Bryan Thompson (her children's father) and a man named Richard went to see a movie at the

Kalamazoo Cinema that began at 11:40 p.m.  She, Jones, Thompson and Richard came home to the

Summit Park Apartments immediately after the movie ended.  (Tr. II, 419-20.)  She saw Petitioner,

who looked like he was upset, walking in circles, talking to himself and hitting a mailbox.  (Tr. II,

422.)  As they were getting out of the car, Lolita Brown came towards her and told her that she

wanted Petitioner to leave Summit Park because he had thrown her telephone.  (Tr. II, 422.)  They

tried to find out what was wrong with Petitioner and to calm him down, but he would not talk with

them.  He simply was talking out loud, saying that "punk ass niggers" had done something to him.

(Tr. II, 423.)  Jones went into Walton's apartment.  Walton eventually went inside, too, before

Petitioner left.  (Tr. II, 423, 25.)  Jones' cell phone rang repeatedly, and Walton wondered what was

going on.  (Tr. II, 424-25.)  Sometime after Petitioner left, Walton heard sirens going toward the

Alamo Hills Apartments, which were located nearby.  (Tr. II,  421, 425-26.)  Shortly after she heard

the sirens, Petitioner came back to her home.  (Tr. II, 426.)  Charles Walker, also known as "China

man" came to her apartment shortly after Petitioner arrived.  (Tr. II, 427.)  China man yelled that "me

and folks" had "aired those bitches out." (Tr. II, 427, 434, 435.)  Petitioner was agitated and took off

his clothing.  (Tr. II, 428, 429.)  Walton did not want the clothing there, and she put it in a bag and

took it to the dumpster.  (Tr. II, 428.)  Petitioner had on clothes underneath those he removed.  (Tr.

II, 429.) Walton asked Petitioner to leave because she did not want him to be in her home.  (Tr. II,

- 10 -

426.) Petitioner left and went down to the front lawn, still upset, until someone came to take him out of Summit Park. (Tr. II, 426.)  Walton testified that she had known Petitioner for four years or more and was fully able to recognize him. (Tr. II, 430.)  Walton identified Exhibit 54 as the same grey "Johnny Blaze" sweatshirt she had thrown in the dumpster. (Tr. II, 430.)

Lolita Brown was the Assistant Property Manager at Summit Park Apartments, where she also resided. (Tr. II, 437.)  In the late evening of June 16 or early morning of June 17, 2002, Petitioner walked up to her window and asked if he could use her telephone, as he had an emergency. She brought her cordless phone to the door of the building, stepped outside, and let him use the phone.  Petitioner was very upset and babbled about someone jumping on him before arriving at Summit Park.  Petitioner made a call and, before ending the call, threw her telephone. (Tr. II, 439.) As manager, Brown asked Petitioner to leave Summit Park.  Petitioner asked to use the phone again. Brown had looked for her first phone, but it had broken in pieces on the sidewalk.  She had another portable phone, but she would not let him use it. (Tr. II, 440.)  Petitioner then kicked the barbeque grill on her patio and hit her mailbox. (Tr. II, 440.)

Brown testified that Tara Walton and the group she was with were the people Petitioner usually visited with when he came to Summit Park.  When Walton came home, Brown told Walton that she wanted Petitioner to leave the grounds.  Petitioner got in Tara Walton's Taurus and smoked a cigarette.  Petitioner was the only person in the car. (Tr. II, 441-42.)  Because she was busy with a series of other problems at Summit Park, she did not see Petitioner leave.  However, both Walton's Taurus and a green Chevy Caprice eventually left, with the entire group of about nine people distributed between the cars. (Tr. II, 443.)  Brown was concerned that something was going

- 11 -

to happen.  Sometime later, Brown heard a lot of sirens leave the police and fire stations and proceed toward Alamo Hills.  (Tr. II, 444.)

Petitioner returned to Summit Park on a bicycle very soon after Brown heard the sirens.  (Tr. II, 445, 449.)  Charles (China man) Walker also arrived and went to Walton's townhouse, which was right next door to Brown's.  Both cars returned, and Brown guessed that something had happened because the people in the cars seemed in disarray.  (Tr. II, 445-46.)  She immediately went to get Walker because he had been living in her home and she did not want her position jeopardized.  (Tr. II, 446.)  He came down to her apartment to talk with her about what was going on.  She did not see Petitioner at that time.  (Tr. II, 447.)  Brown and Walker entered the room in which Walker was staying.  She saw him take a small, silver handgun out of his back pocket and put it in his bag with his belongings.  (Tr. II, 447-48.)  After seeing the gun and learning more, Brown went to speak to Walton.  She returned to her home and told Charles Walker that the girl had been shot and that people said Petitioner did it.  Brown put Walker out of her apartment after this conversation.  (Tr. II, 449.)

Jerome Bryant, Captain of the Criminal Investigation Division of the Kalamazoo Department of Public Safety, testified that he received information on June 19, 2002, that a dumpster at the Summit Park Apartments should be examined for clothing evidence in relation to the homicide.  (Tr. II, 457, 463.)  Detectives Hatter and Alofs looked into the dumpster and requested that an empty garbage truck respond to the location while it was placed under guard by a uniformed officer.  The officer watched the dumpster be emptied into the empty garbage truck.  The truck was then driven to another site, where the contents could be placed on the ground separate from any other items.  (Tr. II, 458.)  The police had been given specific information to look for a blue T-shirt with

something white on it.  They found a blue Nike-type T-shirt.  (Tr. II, 458-59.)  The police found other items in the trash, including certain other unusually valuable items, which they also tagged as evidence. (Tr. II, 459.)  Among the items in the dumpster was a bluish-grey colored "Johnny Blaze" sweat shirt, photographed in Exhibit 54, but they did not take it into evidence because it did not fit the description of the shirt on which they had information.  (Tr. II, 460-61.)  They also located a Nextel telephone and a GPS locating device, as well as a bullet-proof vest, all of which were confiscated because they were things not ordinarily found in the trash.  (Tr. II, 464.)

Crime Lab Specialist Brett Apelgren testified that he attempted to analyze a partial fingerprint taken from a live .9mm round by Gerald Luedecking.  The print was not of sufficiently good quality to make a match.  (Tr. II, 473.)

Lab Technician Gerald Luedecking was charged with photographing the crime scene. He initially stood aside while the firefighters and ambulance personnel were giving aid to the victim. He followed the ambulance and took photographs of the victim at the hospital.  (Tr. II, 480; Tr. III, 546.)  When Luedecking returned to the crime scene, he noticed a .9mm cartridge in one of the hallways, which he collected and processed for evidence.  (Tr. II, 480; Tr. III, 540.)  Thereafter, he took pictures of the entire scene.  In the entry hall, a bullet had grazed one wall and lodged into a second.  He took pictures and retrieved the bullet from the wall.  (Tr. II, 481, 496.)  The door to Angel Ryan's bedroom had eight bullet holes, which were later determined to have been made by a .9mm bullet.  Luedecking found seven shell casings on the floor outside the door.  (Tr. II, 481, 501-02; Tr. III, 584.)  He took pictures and collected the casings.  (Tr. II, 483-84.)  Inside the bedroom door, he found a spent bullet and live .9mm round.  Also, in the clothing on a wicker bedroom chair, he found three .22-caliber shell casings.  (Tr. II, 485, 497, 508; Tr. III, 540.)  He also found bullet

- 13 -

holes and/or bullets in the bed, mattress and boxspring, the curtain, the lower right-hand corner of the window, the wall above the bed, and the floor.  (Tr. II, 503, 505, 507-08.)  The exterior siding of the home showed that three bullets had passed through the wall and traveled outside.  (Tr. II, 509.)  Two other bullets lodged in the brick veneer.  (Tr. II, 510.)  Luedecking testified that he found the eighth shell casing under clothing left by emergency personnel on the floor near where Ryan's body had been found.  (Tr. II, 512, 573.)  The eight rounds fired through the bedroom door were fired from a semi-automatic weapon, because the casings ejected to the right side.  (Tr. II, 513.)  A total of nine .9mm casings were recovered at Alamo Hills.  (Tr. II, 514.)  The bedroom door had been kicked three times, leaving a shoe print, so the door also was collected.  (Tr. II, 502, 517.)  A .22-caliber bullet was found underneath Angel Ryan's body.  (Tr. II, 520.)  Leudecking testified that the three .22-caliber casings found in the chair were ejected by a .22-caliber semi-automatic pistol that was fired three times from essentially the same location inside the bedroom.  (Tr. II, 520-22.)  A search failed to turn up two .9mm bullets to match the recovered casings.  (Tr. III, 562.)  With laser trajectories, Luedecking concluded that two bullets went out the window.  They were not found. (Tr. III, 562-64.)

Luedecking later took photographs of Ryan's autopsy.  She had bullet wounds in her upper right shoulder and in her arm.  She had a bruise-like bullet track that connected both wounds. (Tr. III, 553, 556.)  The bullet passed through her arm, bruising the breast and penetrating the shoulder.  (Tr. III, 557.)  At the autopsy, examiners collected Ryan's fingernail scrapings and blood, as well as two small caliber bullets that had been lodged in her body.  (Tr. III, 549, 587.)

Michigan State Police Detective Sergeant Joseph Roney testified as a firearms identification expert.  (Tr. III, 595.)  All of the .22 bullets collected from the scene are from .22-

- 14 -

caliber long rifle cartridges fired by the same gun, though the markings could not be matched with any firearm in the possession of the police.  (Tr. III, 597, 600.)  The .22 cartridge cases also contained markings indicating they were fired by the same firearm.  (Tr. III, 602.)  Roney could not testify with certainty that the cartridge cases and bullets came from the same weapon.  (Tr. III, 603.)  The other recovered bullets were somewhere between .380 caliber and .9mm caliber in size.  (Tr. III, 607.)  Roney  could not say with certainty that these were fired from the same weapon.  (Tr. III, 609.)

Michigan State Police Forensic Scientist Christine Stepleton testified that she examined the footprint left on the bedroom door and compared it to two pairs of white Nike Air sneakers, sizes 9 and 9 ½, which she had received from the police.  (Tr. III, 622-27, 629.)  She concluded that both pairs of shoes had certain class characteristics and very similar pattern agreement in common with the door print.  (Tr. III, 627-30.)  She could not positively identify or eliminate either of the two pairs of shoes.  (Tr. III, 630.)  The print was not sufficiently clear to enable her to identify any individual characteristics, such as nicks or cuts, specific to either pair.  (Tr. III, 631.)

Forensic pathologist Dr. Valdemar Palutke testified that he conducted the autopsy and examination of Angel Ryan on June 18, 2000.  He found that she had received two gunshot entrance wounds, one in the right middle shoulder/upper arm area and one in the right clavicle.  (Tr. III, 638, 643.)  Neither had an associated exit wound.  He also noted an entrance wound to the inner aspect of the right arm with an exit wound to the right armpit area.  (Tr. III, 639-40.)  The bullet track grazed the right side of her breast.  The injuries demonstrated that the arm was at Ryan's side when she was shot, and the shot traveled from back to front and downward.  (Tr. III, 640-42, 648.)  The

entrance wound closest to Ryan's face showed that the small-caliber bullet perforated the pericardium, through the aorta, and through the heart, lodging in the pericardium. The other wound track entering near the shoulder entered the right chest near the second rib and perforated the upper and lower lobes of the right lung, and was recovered in the mid- to lower-back near the spine. The wound path of the bullet nearest Ryan's face was slightly back-to-front, right-to-left and downward. (Tr. III, 643-646.) The other wound path was slightly front-to-back, right-to-left, and downward. (Tr. III, 647.) Palutke could not say which of the wounds ultimately caused death. The wound in the armpit area was not likely to cause death. Either of the two wounds to the shoulder/clavicle area could have been fatal. (Tr. III, 648-49.)

Phillip Mlemchukwu testified that, in the late nighttime or early morning hours of June 6-17, 2000, he, Philip Smith and Smith's cousin, David Alexander, were on their way to visit a friend at 1501 Alamo Hills Apartments. (Tr. III, 677, 679.) Before he entered the building, a number of people told him, "Don't – if I was you just don't go in the building." (Tr. III, 678.) As he was wondering about the statements, he saw people running out of the building, who also told him not to go in. (Tr. III, 678.) He, Smith and Alexander stood in the front of the building. He was walking into the building when he heard gunshots. He stopped and was going to walk away when he saw about 20 people screaming and running out of the building. (Tr. III, 679.) He then saw a dark-skinned man run out of the building. The man dropped a pistol and then picked it up. (Tr. III, 680.) The man apparently thought Smith said something to him and approached Smith saying, "What did you say to me?" He then used the pistol to hit Smith in the head, near the right temple area. Mlemchukwu, Smith and Alexander then ran to the other side of the 1501 Alamo Hills building. (Tr. III, 680-81.) They ran all the way around the back street, Revere Road, and down

- 16 -

Douglas Street, to come back to the apartments.  When they got back, they saw police and ambulances.  (Tr. III, 681.)  Mlemchukwu went to his own apartment in 1407 Alamo Hills.  He did not see either Smith or Alexander until the next morning.  (Tr. III, 682.)  At that time, Smith came to his house and told him that he had gone to the hospital.  Smith had three or four stitches in his right forehead area.  (Tr. III, 683.)  Mlemchukwu could not identify Petitioner and could describe the person only as dark-skinned.  (Tr. III, 683.)

David Alexander testified that he had been at Alamo Hills with Mlemchukwu and Smith on the night of the shooting.  (Tr. III, 690.)  They were going to visit a friend.  As they approached, he saw five or six men run out of the building.  The last one bumped into Mlemchukwu and dropped his gun.  The man apparently thought Alexander said something to him.  Alexander denied it and Smith stepped in front of Alexander.  The man hit Smith in the forehead with the pistol.  (Tr. III, 691.)  Alexander described the man as black, chubby, about 250 pounds, with a low haircut.  (Tr. III, 692.)  Alexander could not identify Petitioner.  (Tr. III, 692.)  Smith and Alexander ran off together.  Smith had a deep cut in his forehead.  Alexander saw Smith after he returned from the hospital.  (Tr. III, 693.)

The court heard evidence of the efforts that had been made by the prosecution to serve a subpoena on Philip Smith and found that the prosecutor had demonstrated due diligence.  (Tr. III, 656-72.)  As a consequence, the court ruled that Smith's preliminary examination testimony could be introduced into evidence.  (Tr. III, 673.)  According to Smith's preliminary examination testimony, Smith went to the Alamo Hills Apartment complex at about midnight on June 17, 2000.  (Tr. III, 696, 698.)  He, Alexander and Mlemchukwu were walking past the Building 1501 when three men ran out of the building.  Petitioner ran out shortly thereafter.  (Tr. III, 697-98, 701-03.)

- 17 -

Petitioner bumped into Smith's cousin, Alexander and began to "talk[] crazy" to his cousin.  Smith got in between them and told Petitioner that Alexander had not said anything.  Petitioner told Smith to put his hand down.  When Smith did so, Petitioner struck him in the head with a black pistol.  (Tr. III, 699-700.)

Detective Kenneth Alofs was called into the station on the night of the shooting.  After receiving a short briefing on the case, he interviewed witnesses including McCormack and Tabor.  (Tr. III, 707, 712.)  After he had completed those interviews, he was advised by Lieutenant Martin that Petitioner, who was a suspect, was at the Pinehurst Townhomes.  He went to the reported address and arrested Petitioner on June 17, 2000.  (Tr. III, 708.)  After bringing Petitioner to the station and reading him his *Miranda* warnings, Alofs questioned Petitioner.  Petitioner initially denied having anything to do with the shooting.  When Alofs asked if Petitioner had had a problem that evening with "Clifford," Petitioner denied knowing what Alofs was talking about.  Alofs asked Petitioner to explain where he had been that evening.  Petitioner stated that he had been at his girlfriend's house at the Alamo Hills Apartment complex from before dawn on the June 16 until it was starting to get dark that evening.  Petitioner claimed he then took a bus to the Pinehurst Apartments, where he had been arrested.  (Tr. III, 710-11.)  Alofs told Petitioner he did not believe him, as the information Alofs had from his interviews with McCormack and Tabor placed Petitioner at the scene with a gun.  Petitioner then asked, "How can you charge me with murder, you got a gun? . . . How are you going to charge me for murder without a gun?"  Alofs told Petitioner that they did not need to physically recover the gun to charge him because witnesses placed him there.  Petitioner responded, "Did you see me shoot?"  Alofs acknowledged that he did not, but offered Petitioner

another opportunity to tell him what had happened that night. (Tr. III, 712.) Petitioner advised Alofs that he did not want to talk further, and the interview was terminated. (Tr. III, 713.)

On June 18, 2000, Alofs was informed by the jail staff that Petitioner wanted to speak to him. Petitioner was again brought into the video arraignment room for questioning. After assuring that Petitioner did wish to speak, Alofs reminded Petitioner of his *Miranda* rights. Petitioner told Alofs, "You need to look at China man." (Tr. III, 713-14.) When Alofs asked why he would need to speak with China man, Petitioner told Alofs that China man was actually the person who entered the apartment and was the one who was shooting in the apartment and shot Ryan. (Tr. III, 714.) Petitioner admitted to Alofs that he had gotten into a fight with McCormack in the early morning hours of June 17, 2000. He described having been at a house drinking and being given a ride by a girl back to the Alamo Hills Apartments. Petitioner stated that the girl made comments toward him and that McCormack became upset. They got out of the car at a gas station and McCormack blindsided Petitioner and beat him up. (Tr. III, 715.) Petitioner claimed that he got a ride from an unknown person who drove him to Summit Park Apartments. He met Charles Walker (China man) in the parking lot. Petitioner told Walker what had happened to him at the gas station and they went together to the Alamo Hills apartment. Petitioner claimed that he intended at that time to have a one-on-one confrontation with McCormack. When they arrived, Walker knocked on the door. When the door was opened, Walker pulled out a gun, fired it, and followed McCormack into the apartment. Petitioner claimed that he stayed in the hall the whole time and heard several shots fired and a female voice screaming and crying. (Tr. III, 716.) Walker came running out of the apartment and Petitioner followed him. Walker got into the car in which they had arrived. Petitioner flagged down another driver and told him he was being chased. The driver gave him a ride. (Tr. III, 716.)

Alofs testified that, during the course of investigation, he received information about the location of the two guns used at the incident. The .22-caliber handgun was reported to be in the southwestern-most pond of the three ponds at Park and Crosstown area. The Michigan State Police dive team came out on two occasions to try to recover the gun, but were unsuccessful. (Tr. III, 717-18.) Alofs also received information that the .9mm handgun was tucked in a hole or rusted out area of a dumpster at Summit Park Apartments. No such hole or rusted area could be located. (Tr. III, 718.)

When Alofs arrested Petitioner on June 17, 2000, he took Petitioner's white Nike Air athletic shoes. (Tr. III, 721.) On June 22, 2000, when Charles Walker was arrested in conjunction with the case, Alofs took Walker's white Nike Air tennis athletic shoes. (Tr. III, 722-24.) After police received information that Petitioner's clothing was in the dumpster at the Alamo Hills Apartments, Alofs and Detective Hatter conducted a preliminary examination and found nothing obvious. As they began to leave the complex, they began getting calls from dispatch, advising them that people were calling to say that the officers had not searched thoroughly enough. Alofs and Hatter then called Best Way Disposal with instructions to come with an empty truck, unload the dumpster and bring it to the transfer station. Alofs did not personally search the contents. (Tr. III, 726.) He arrived after the search had been completed. The search turned up a blue-colored Nike T-shirt, a pair of blue jeans, a bullet-proof vest, a cell phone and a Global Positioning Unit (GPS). (Tr. III, 727.) The prosecution rested its case. (Tr. III, 739.)

Petitioner was called as the sole witness in his own defense. (Tr. III, 740.) Petitioner testified that, on June 16, 2000, he spent part of the morning with McCormack, Lewis and their friend, Mr. Frisbee. At about 1:00 p.m., the group joined Tabor, Sims and a friend of Tabor's, and

they continued to party.  (Tr. III, 742-43.)  Tabor, Sims, McCormack, Lewis and Petitioner later got

into Tabor's car.  They all were drunk and Petitioner was talking loudly.  According to Petitioner,

he was seated behind the driver's seat and was very cramped.  He repeatedly asked Tabor to move

her seat forward, but she refused.  (Tr. III, 743.)  The car eventually pulled into a Shell gas station

and Tabor jumped out.  Petitioner jumped out, too, and began to argue with Tabor.  He became angry

and kicked the door of the car.  Lewis, Sims and McCormack jumped out of the car and McCormack

told Petitioner, "Get out my girl's face."  Petitioner did not turn toward McCormack, but continued

to argue with Tabor.  McCormack punched him in the side and, when he fell, began choking him,

saying, "I told you.  I told you."  Lewis pulled McCormack off Petitioner and the others moved

toward the gas station.  (Tr. III, 744.)  Petitioner went toward the pay phone.  He got a ride with a

man who was near the phone.  The man drove him to Summit Park.  (Tr. III, 744-45.)

When he arrived at Summit Park, Petitioner was upset and angry.  (Tr. III, 746, 770.)

He was pacing out front while talking on a cordless telephone.  He saw China man Walker approach

from behind the other buildings.  Petitioner had known Walker since he arrived from Chicago the

previous month.  (Tr. III, 746-47.)  Petitioner threw the telephone and punched a mailbox.  (Tr. III,

770.)  He told Walker what had happened at the Shell station.  (Tr. III, 747.)  He then went inside

to his friend's apartment because he had cut his hand by punching the mailbox.  (Tr.  III, 748.)

Walker came to the door of the apartment ten minutes later and told Petitioner to come outside.

Walker said he would "take me to where the guys is at."  (Tr. III, 748.)  Petitioner did not question

Walker about where they were going, but he wanted to go because he wanted to fight McCormack,

who he felt had blindsided him in the earlier fight.  (Tr. III, 749.)  Petitioner reported that most of

the few possessions he had in Kalamazoo were stored at the Alamo Hills apartment of his girlfriend,

Tasha Williams.  However, he had left a pair of pants at Summit Park when he had changed a few days before to play basketball.  (Tr. III, 750.)  Petitioner denied owning or possessing any firearms.  (Tr. III, 751.)  Petitioner testified that, when he went to Alamo Hills, he did not know that Walker had any firearms.  (Tr. III, 751.)  He knew that McCormack stayed at the Ryan apartment in Alamo Hills because he had previously been there with Antwon Lewis.  (Tr. III, 752.)  Petitioner had met Ryan on two prior occasions and they had never had a disagreement.  (Tr. III, 754.)  When they arrived at Apartment 105, Petitioner knocked on the door.  He heard the door being unlocked and saw it open.  He glanced at Walker and saw him draw a gun from under his shirt.  (Tr. III, 755.)  Petitioner testified that this was the first time he was aware Walker was carrying a gun, and Petitioner denied having any intention to use a firearm during the encounter.  (Tr. III, 756.)  When McCormack peeped out of the door, he could see Petitioner and Walker.  He looked at them and slammed the door.  Walker kicked the door open and Petitioner jumped back, shocked.  (Tr. III, 756.)  Petitioner testified that he never entered the apartment.  (Tr. III, 757.)  He heard the first shot as Walker entered.  He heard seven or eight shots later, as well as women screaming.  (Tr. III, 758.)  Walker eventually ran out of the apartment carrying a gun in his hand.  Petitioner ran about ten steps behind Walker.  (Tr. III, 759.)  Outside, he saw Walker ahead of him, and he turned back behind the buildings and down the hill.  He stopped at a gas station on Douglas near a stop sign.  He stopped an unidentified driver and asked him to drop him off because someone was chasing him.  (Tr. III, 760.)  The driver took him to Pinehurst, where he knew Sherri Bradford lived.  Bradford was the mother of his brother's children.  (Tr. III, 761.)  Petitioner stayed at Bradford's until early the next morning when police arrived.  (Tr. III, 761.)  Petitioner denied ever owning a Johnny Blaze sweatshirt or a light blue T-shirt like those found in the dumpster.  (Tr. III, 762.)  He reported that

- 22 -

Walker was wearing a sky blue, white and dark blue button-up jersey with a white design.  (Tr. III,
763.)  The defense rested.  (Tr. III, 772.)

At the conclusion of trial, on November 13, 2000, the jury found Petitioner guilty of
first-degree felony murder and not guilty of the remaining seven charges.  (Tr. IV, 754.)  On
December 4, 2000, Petitioner was sentenced to serve a term of life without parole.  (Sentencing
Transcript ("S. Tr.") 10, docket #26.)

## B.  Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which
was filed by counsel on August 3, 2001, raised the same two issues he has raised in this application
for habeas corpus relief.  (See Def.-Appellant's Br. on Appeal, docket #27.)   By unpublished
opinion issued on August 27, 2002, the Michigan Court of Appeals rejected all appellate arguments
and affirmed Petitioner's convictions and sentences. (See 8/27/02 Mich. Ct. App. Opinion ("MCOA
Op."), docket #27.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme
Court.  Petitioner raised the same two claims raised before and rejected by the Michigan Court of
Appeals.  By order entered March 31, 2003, the Michigan Supreme Court denied his application for
leave to appeal because it was not persuaded that the questions presented should be reviewed.  (See
Mich. Ord., docket #28.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB.
L. 104-132, 110 STAT. 1214 ("AEDPA").  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). The
AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect

to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal

principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

Petitioner raises two grounds for habeas relief. First, he contends that he was denied due process because the jury's inconsistent verdicts demonstrate that his felony-murder conviction was supported by insufficient evidence. Second, he asserts that the jury instruction on felony murder was confusing and incorrect and thereby denied him due process and a fair trial.

I.      <u>Denial of Due Process – Inconsistent Verdicts</u>

      Petitioner was convicted of first-degree felony murder.  He was acquitted of the underlying felony that would support the felony-murder charge, first-degree home invasion.  He also was acquitted of the charges of assault with intent to murder Clifford McCormack, felonious assault of Philip Smith and four associated charges of possession of a firearm during the commission of a felony.  Petitioner argues that the inconsistent verdicts demonstrate that the jury had insufficient evidence for its finding of guilt on the felony-murder charge.

      A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*  Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390, 401-402 (1993).  Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

      The Michigan Court of Appeals, applying the standard set forth in *Jackson*, held as follows:

> The prosecutor had an obligation to prove beyond a reasonable doubt that Baynes (1) killed a human being, (2) with malice, (3) while committing, attempting to commit, or assisting someone in committing one of the felonies enumerated in

MCL 750.316. The prosecutor alleged first-degree home invasion as the predicate felony for the felony-murder charge. The elements of first degree home invasion are: (1) breaking and entering or entering without permission, (2) a dwelling, (3) with intent to commit a felony, larceny, or assault in the dwelling, and (4) while entering, present, or exiting, the defendant is armed with a dangerous weapon or another person is lawfully present.

When we view the evidence in the light most favorable to the prosecutor, there is no question that the prosecutor satisfied the burden of proving Baynes' guilt beyond a reasonable doubt. A number of elements were not in dispute. For instance, there was no question that . . . Ryan had been killed or that Ryan was present in the apartment when Baynes and Walker entered it. Numerous witnesses indicated that Baynes broke and entered, or entered without permission, Ryan's apartment, and assaulted McCormack, chasing him down the hallway while firing a gun at him. There was also significant evidence that Baynes intended to commit a felonious assault against McCormack when he broke into the apartment. According to Baynes' own admission, he went to Ryan's apartment specifically to fight McCormack. Several witnesses testified that a physical fight had occurred between Baynes and McCormack at a gas station earlier on the night in question and that Baynes was quite angry about that fight before he went to Ryan's apartment. Witnesses also observed that Baynes possessed a gun at the time he entered Ryan's apartment.

Further, the evidence indicated that while committing the home invasion, Baynes killed Ryan by shooting into her bedroom, an action that was highly likely to cause death. Malice may be inferred from evidence that "defendant intentionally set in motion a force likely to cause death or great bodily harm." Accordingly, the evidence was clearly sufficient, when viewed in the light most favorable to the prosecution, to support the conviction of first degree felony murder.

(8/27/02 MCOA Op. at 2-3 (footnotes with citations omitted).)

The state court's decision clearly is neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. 28 U.S.C. § 2254 (d). The record contains ample evidence to support the jury's felony-murder conviction beyond a reasonable doubt. Petitioner himself corroborated the stories given by Michelle Sims, Latisa Tabor, Antwon Lewis, and Clifford McCormack about the events of that night up to the time he and McCormack fought at the Shell gas station. He testified that he was extremely angry with McCormack. He corroborated the

testimony of Christina Kinnee, Tara Walton and Lolita Brown about his anger with McCormack after the fight and his destructive rage at the Summit Park Apartments. Petitioner acknowledges that he went to Ryan's Alamo Hills apartment in order to assault Clifford McCormack. Despite the fact that Petitioner denied actually entering Ryan's apartment and denied either possessing or using the gun, the jury easily could have believed the testimony of Floyd Ryan and Clifford McCormack, both of whom positively identified Petitioner as the person who came into the apartment that night with a gun in his hand, chasing McCormack down the hall and firing gunshots. The jury also could have believed the testimony of Tara Walton about Petitioner's return to her home after the shooting and the removal of his clothing. In addition, despite acquitting Petitioner of the assault on Philip Smith, the jury could have believed preliminary examination testimony of Philip Smith, who identified Petitioner as a man who ran out of the building after the shooting, carrying a handgun. The evidence presented in the case was more than sufficient to support the jury's verdict.

The conclusion that the verdict is supported by sufficient evidence is not undermined by the inconsistency in the jury's verdict on the remaining charges. The Michigan Court of Appeals held that, under well established Michigan law, consistent verdicts are not required. *See People v. Vaughn*, 295 N.W.2d 354 (Mich. 1980). The court of appeals observed that a jury need not convict a defendant of the underlying felony in order to convict him of another felony that incorporates the elements of the underlying felony. *People v. Lewis*, 330 N.W.2d 16, 19-20 (Mich. 1982). The only relevant issue is whether the crime of conviction is supported by sufficient evidence. *People v. Cazal*, 316 N.W.2d 705 (Mich. 1982).

While the Michigan Court of Appeals relied upon Michigan law in reaching its determination, the legal standard it applied is consistent with the holdings of the United States

Supreme Court on this issue. The Supreme Court has long held that inconsistency in a verdict is not a sufficient basis for habeas corpus relief. *Harris v. Rivera*, 454 U.S. 339, 345 (1981). The Court squarely has held that "a criminal defendant convicted by a jury on one count [may] not attack that conviction because it [i]s inconsistent with the jury's verdict of acquittal on another count." *United States v. Powell*, 469 U.S. 57, 58 (1984) (inconsistent verdicts provide no basis for reversal; conviction for compound crime upheld where defendant was acquitted of predicate crime) (citing *Dunn v. United States*, 284 U.S. 390 (1932)). *See also United States v. Smith*, 182 F.3d 452, 457 (6th Cir. 1999); *United States v. Patrick*, 965 F.2d 1390, 1396 (6th Cir. 1992) (inconsistent jury verdicts may not form the basis for setting aside proper convictions on other counts); *United States v. Clemmer*, 918 F.2d 570, 573 (6th Cir. 1990); *United States v. Martin*, 897 F.2d 1368, 1373 (6th Cir. 1990). "[W]here truly inconsistent verdicts have been reached, '[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.'" *Powell*, 469 U.S. at 64-65 (quoting *Dunn*, 284 U.S. at 393.)

To be entitled to habeas corpus relief, a petitioner must show that the right he seeks to vindicate is clearly established by holdings of the United States Supreme Court. *See Williams*, 529 U.S. at 412. The Supreme Court has never held that a state criminal guilty verdict is unconstitutional because it conflicts with inconsistent verdicts of acquittal on other charges. In fact, the law is completely to the contrary. *See Powell*, 469 U.S. at 58. The determination of the Michigan Court of Appeals was therefore fully consistent with controlling United States Supreme Court precedent. As a consequence, I recommend that Petitioner's first ground for habeas relief be denied.

- 29 -

II.     <u>Denial of Due Process – Jury Instructions</u>

In his second ground for habeas relief, Petitioner contends that the trial court gave an incorrect and confusing instruction on the intent required to prove felony murder.  The instructions in issue involve whether the felony murder charge required proof of specific intent.  The trial court gave the following instructions on first-degree murder and home invasion:

> The crime of first-degree premeditated murder requires proof of a specific intent.  This means that the Prosecution must prove not only that the Defendant did certain acts but that he did the acts with the intent to cause a particular result.

> For the crime of first-degree premeditated murder this means that the Prosecution must prove that the Defendant intended to kill.  The Defendant's intent may be proved by what he said, what he did, how he did it or by any other facts and circumstances in evidence.

> That instruction was just on first-degree premeditated murder, that is a specific intent offense.

> I'm now going to give you an instruction on first-degree felony murder, which is not what is known as a specific intent offense.

> The Defendant is charged with first-degree felony murder.  To prove this charge the Prosecutor must prove each of the following elements, beyond a reasonable doubt:

> First, that the Defendant caused the death of Angel Ryan, that is, that Angel Ryan died as a result of a gunshot wound, or wounds.

> Second, that the Defendant had one of these three states of mind:

> He intended to kill; or
> He intended to do great bodily harm to Angel Ryan; or
> He knowingly created a very high risk of death or great bodily harm, knowing that death or such harm would be the likely result of his actions.

> Third, that when he did the act that caused the death of Angel Ryan, the Defendant was committing or helping someone else commit the crime of what is known as "Home invasion, first-degree".

- 30 -

Now, at – at this point I wanna point out to you I'm gonna give you the elements of home invasion, first-degree, which is a charged offense in this case, but I'm giving you the elements of home invasion first-degree because there's an element that you are to find if you find that first-degree felony murder was committed.

For the crime of home invasion, first-degree, the Prosecutor must prove each of the following elements, beyond a reasonable doubt:

First, that the Defendant broke into a dwelling. It does not matter whether anything was actually broken; however, some force must have been used. Opening a door, raising a window, and taking off a screen are all examples of enough force to count as a breaking.

Entering a dwelling – forget that entering a dwelling.

Secondly, that the Defendant entered the dwelling. It does not matter whether the Defendant got his entire body inside. If the Defendant put any part of his body into the dwelling after the breaking that is enough to count as an entry.

First element is breaking into the dwelling. The second element is entering the dwelling, as I've defined it.

Third, that when the Defendant broke and entered the dwelling he intended to commit the offense of murder, as it's been defined, or assault with intent to commit murder, as I will define it to you in a few moments.

Fourth, that when the Defendant entered, was present in, or was leaving the dwelling either of these circumstances existed:

He was armed with a dangerous weapon and/or another person was lawfully present in the dwelling.

Now, I'm coming back to first-degree felony murder, to the elements.

The Defendant must have been either committing or helping someone else commit the crime of murder or assault with intent to commit murder. To help means to perform acts or give encouragement before or during the commission of the crime that aids or assists in its commission. At the time of giving aid or encouragement the Defendant must have intended the commission of murder or assault with intent to commit murder.

(Tr. IV, 846-49.)  Defendant contends that, by instructing the jury that felony-murder was not a specific intent crime, the trial court misstated the law as it applied to the facts of the case, thereby denying him due process and a fair trial.  He argues that, because the underlying offense of first-degree home invasion is itself a specific intent crime, jurors necessarily were required to find specific intent in order to convict him of felony murder.

The Court of Appeals held that "[b]ecause Baynes failed to preserve this issue for appeal by objecting to the trial court's instructions, he is entitled to relief only if he can demonstrate plain error affecting his substantial rights." (8/27/02 MCOA Op. at 3-4; docket #27.)  Applying the plain-error standard, the court of appeals held:

> Contrary to Baynes' contention, first degree felony murder does not require a specific intent to kill, and is therefore not considered a specific intent crime.  Rather the trial court properly instructed the jury on the malice required for felony murder.  Moreover, the trial judge properly instructed the jury regarding the intent requirements for second degree murder and first degree home invasion.  Because the trial court's instructions were correct, Baynes has failed to establish plain error.  Accordingly, his argument is without merit.

(8/27/02 MCOA Op. at 4; docket #27.)

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,*

377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).  If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim "will result in a fundamental miscarriage of justice."  *Hicks*, 377 F.3d at 551-52; *see Murray v. Carrier*, 477 U.S. 478, 495 (1986)) (specifying that a 'fundamental miscarriage of justice' will result "where a constitutional violation has probably resulted in the conviction of one who was actually innocent.").  A state law procedural rule is adequate and independent when it was "firmly established and regularly followed" at the time of the asserted procedural default.  *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)).

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim.  It is clear that the contemporaneous objection rule regarding jury instructions was well-established at the time of Petitioner's trial in 2000.  *See, e.g.*, *People v. Kelly*, 378 N.W.2d 365, 369-70 (Mich. 1985); *People v. Curry*, 437 N.W.2d 310, 314 (Mich. Ct. App. 1989); *People v. Kendrick*, 195 N.W.2d 896 (Mich. Ct. App. 1972).  This contemporaneous objection rule serves an important State interest in ensuring that counsel do their part in preventing trial courts from providing juries with erroneous instructions.  *See Osborne v. Ohio*, 495 U.S. 103, 123 (1990) (holding that failure to urge the trial court to instruct was an adequate state law ground to prevent reaching the federal claim).

Although the Michigan Court of Appeals proceeded to review Petitioner's claim for plain error, in this circuit, "plain error review does not constitute a waiver of state procedural default

- 33 -

rules." *Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000) (citations omitted); *see Lundgren v. Mitchell*, 440 F.3d 754 (6th Cir. 2006); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000).  As a consequence, Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court.  *See Wainwright*, 433 U.S. at 87-88; *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).  Accordingly, review by this court is barred unless Petitioner can show cause and prejudice or that he is actually innocent of the offense.  *Coleman*, 501 U.S. at 750; *Murray v. Carrier*, 477 U.S. 478, 485 (1986).

To show cause sufficient to excuse a failure to object at trial, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the objection. *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991).  Petitioner has not attempted to explain his failure to object to the jury instructions as given.  Where a petitioner fails to show cause, the court need not consider whether he has established prejudice.  *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).  Further, Petitioner had not attempted to demonstrate that he is actually innocent of the offense.  *See Murray*, 477 U.S. at 495. Accordingly, because Petitioner's claim is procedurally barred, his application for habeas review should be denied.

Moreover, even were the Court to excuse Petitioner's procedural default, his claim would be rejected as meritless.  Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review.  Instead, Petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  *See also Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (erroneous jury

- 34 -

instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000) (same).  If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law. *Id.*

Here, as the court of appeals found in its review for plain error, the instructions were substantially correct as given.  Although the instructions required the jury to find guilt on a specific intent crime (first-degree home invasion) as a predicate to a finding of guilt of the general intent crime (felony murder), the instructions as to each element of both offenses were complete and accurate.  The instructions in their entirety cannot be said to have "so infused the trial with unfairness as to deny due process of law." *Estelle*, 502 U.S. at 75.

For both reasons, Petitioner's second ground for habeas relief is without merit.

## Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied.

Dated:   April 6, 2006                          /s/  Joseph G. Scoville_____
                                                United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).